IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Helen Allen, | |
| Plaintiff, | |
| | Case No. 21-cv-962 |
| v. | |
| Ford Motor Company, | Judge Mary M. Rowland |
| Defendant. | |

# ORDER

Plaintiff Helen Allen brings this action against her former employer, Defendant Ford Motor Company (Ford) claiming that it violated federal and state employment statutes prohibiting race and gender discrimination, retaliation as well as state law claims of intentional infliction of emotional distress and assault. For the reasons stated below, Defendant's motion for summary judgment [79] is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the

1

non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## I.  Local Rule 56.1

In moving for summary judgment, Ford initially argues that Allen failed to comply with Local Rule 56.1. "Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted). This applies as well to a *pro se* litigant. *See Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011); *Clay v. Williams*, No. 17 C 6461, 2020 WL 2836740, at *2 (N.D. Ill. May 31, 2020) (collecting cases).

The Court agrees that Allen's Local Rule 56.1 submissions are improper. First, Allen's response to Ford's 56.1 statement of facts does not properly dispute any of Ford's stated facts. As Ford noted, Allen does not cite to any record evidence to dispute Ford's asserted facts. In some cases, she does not state any reason for disputing a fact. *See* Pl. Resp. at ¶¶ 31, 51, 77, 93, 101, 102 (no reason for disputed fact); *see e.g.*, Pl. Resp. at ¶ 23 ("Dispute – The truce lasted 3 weeks"); *id.* ¶ 32 ("Dispute – Sabotage"). Where "a party merely disagrees with the movant's asserted facts that is inadequate to defeat summary judgment if made without reference to specific supporting material." *SMS Fin. Recovery Servs., LLC v. Canelo*, No. 21-cv-04000, 2023 WL 2161660, at *2 (N.D. Ill. Feb. 22, 2023). As such, the facts in Ford's statement of facts are deemed admitted.

Second, Allen's statement of additional facts is improper. A majority of these facts are not supported by citations to the record. Some of the facts are mere recitations of facts offered by Ford. *See* PSOF at ¶¶ 9 – 15; 21. Some are legal conclusions and others are statements that are not relevant to any of Allen's claims. *Id.*, at ¶¶ 80, 84, 36, 58, 104, 71. Where there are citations to the record, often they cite to what Allen calls "New Evidence". The "New Evidence" includes documents that were previously not produced in the litigation. Dkt. 112 at 3. In addition, Allen does not explain how the New Evidence bears on her current claims against Ford.[1]

---

[1] Allen cites an Illinois Worker's Compensation Commission ("IWCC") arbitration decision that was not produced in discovery. Dkt. 112 at 3. It is not relevant to this litigation as it concerns a different Ford facility, the Sharonville facility. Pl. Ex. Z-19, Dkt. 110. The Court previously denied Allen's request to amend her complaint and include claims from her tenure at the Sharonville facility. Dkt. 62.

2

Allen submitted 44 exhibits totaling 1,050 pages. Allen does not properly cite to this evidence. *See e.g.*, Pl. Resp. at ¶ 7 ("…New Evidence – Exhibit Z-19"); *id.*, at ¶ 13 ("…New Evidence – Larese Deposition). In some cases, she does not cite to any exhibit number, and it is often unclear if the material she cites was filed on the docket. *See e.g.* Pl. Resp. at ¶ 25 ("…Drummer 30B6"); *id.*, at ¶ 43("…Drummer 30B6-King, Lawanda). Many of the exhibits are duplicates of each other and in some instances, the same exhibit was submitted by Ford. *See* Dkt. 112 at n.2.

The Court is mindful that Allen is representing herself in this case. Still, Ford provided her with notice of her obligation in opposing summary judgment [84]. And the Court is not obligated to sift through hundreds of pages of documents to try to find potentially relevant evidence and arguments favoring Allen. *See D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) ("the district court's role in deciding the [summary judgment] motion is not to sift through the evidence, pondering the nuances and inconsistencies…"); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("it was not the district court's job to sift through the record and make [the party's] case for him"). Therefore, in deciding the present motion, the Court deems all the facts in Ford's statement of facts admitted and does not consider Allen's "New Evidence."

## BACKGROUND[2]

### I. Allen Training and Ford's Anti-Harassment Reporting Procedures

Allen is an African-American Muslim woman. DSOF at ¶ 3. Ford hired Allen in 2000 and she eventually transferred to its Chicago Assembly Plant (CAP) in Chicago, Illinois, where she worked as an hourly plumber/pipefitter from January 23, 2012, until August 4, 2016. *Id.* at ¶¶ 5-6. Allen then transferred to another Ford facility in Ohio, where she a took a medical retirement in August 2020. *Id.* ¶ 7. CAP employed over 4,600 people total and over 1,000 per shift when Allen worked there. DSOF at ¶ 2. A local chapter of the United Auto Workers ("UAW") represented Allen. *Id.* ¶ 14. Throughout Allen's tenure at CAP, Ford had a comprehensive Anti-Harassment Policy. DSOF ¶ 15. The Policy tells employees to "immediately report" alleged harassment to supervisors, local HR representatives (known as Labor Relations for hourly employees), or Ford's antiharassment hotline. *Id.* ¶ 18. Allen was trained on the Policy and understood it, *id.* ¶¶ 20, 116.

### II. Allen's First Complaints at CAP

---

[2] These facts come from Ford's statement of facts [81]. Defendant's Rule 56.1 statement is at Dkt. 81 ("DSOF"); Plaintiff's Rule 56.1 statement is at Dkt. 113-1 ("PSOF"); Plaintiff's response to Defendant's Rule 56.1 statement is at Dkt. 91 ("Pl. Resp."); Defendant's response to Plaintiff's statement of facts is at Dkt. 113 ("Df. Resp.").

3

In May 2012, Allen emailed a production manager, claiming that CAP was "dysfunction[al]" and that she "pray[ed] that this plant shuts down, so [she] [could] get a transfer to anywhere." DSOF at ¶ 21. In August 2012, Allen gave a handwritten note to Labor Relations, claiming that she had become a "bulls eye" because of her May 2012 complaint. *Id.* ¶ 22. Allen claimed her superintendent was "very harsh" to her and "micro-manage[d]" her by, among other things, "insisting" that she carry a radio. *Id.* Allen asserted that the superintendent was "discriminating" against her because she was "a black, [M]uslim female that he can't intimidate or sleep with." *Id.* Labor Relations interviewed Allen, who explained the superintendent's "harsh" style was directed at all employees, not just her. *Id.* at ¶ 23. When asked how the superintendent "was discriminating against" her in particular, Allen could not "pinpoint" any specific behavior because, she said, "[i]t's just a feeling that may not be accurate." *Id.* Labor Relations closed the complaint, finding no evidence of discrimination on the basis of race, religion, or gender. *Id.* at ¶ 26.

In April 2013, Allen filed the first of her three Charges with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation and discrimination based on race, color, gender, and religion. DSOF at ¶ 29. She claimed she had been disciplined twice but that "non-Black, light skinned employees" were "not disciplined as severely". *Id.* Allen did not identify who had retaliated against her or for what protected activity. *Id.* She also claimed that she had been denied an unspecified "religious accommodation." *Id.* The Charge did not mention racial or sexual harassment. *Id.*

In July 2013, Allen emailed CAP's Plant Manager, complaining she had been "harassed and retaliated against" because of her "race and religion and [she] [was] sure some other prejudices." DSOF at ¶ 30. She asserted that she had been denied "proper lunches and break," and that when she complained, she became "more of a bulls eye." *Id.* Allen also claimed that she "hear[d] foul language every hour of the day," but provided no examples, and did not state who used the language, whether it was directed at her, or whether it was racial or sexual in nature. *Id.*

Next, in December 2013, Allen emailed CAP's HR Manager, claiming that a male security contractor had "used massive profanity towards" her. DSOF at ¶ 32. When interviewed, Allen conceded the situation arose after she had "made a mistake." *Id.* ¶ 33. Allen had caused a flood by draining CAP's fire protection system without first turning off the water. *Id.* at ¶ 34. The security contractor purportedly told Allen, "if you don't know what the F you're doing, don't touch the MF system." *Id.* at ¶ 33. In response to Allen's email, Ford interviewed several witnesses to the flood, including the security contractor, who denied using any profanity toward Allen. *Id.* at ¶ 34.

### III. Allen's 2014 Harassment Complaints

4

On January 15, 2014, Allen gave a statement to Labor Relations, claiming for the first time that she heard "sex talk[]" at CAP "not once a month, [but] once a day." DSOF at ¶ 36. When pressed, Allen made several claims about a male Plant Engineering Manager. *Id*. She alleged that when she told the Plaint Engineering Manager that she had not signed off on work orders, he responded: "What the fuck [do] you want me to do?" *Id*. She claimed she overheard that same engineering manager, on separate occasions, say one employee had a "small weenie" and another "sucks and swallows." *Id*. Allen also alleged that a male hourly carpenter had made a "sexual joke" she could not recall. *Id.* at¶ 37. Later that day, Allen asked Labor Relations to "pull[]" her complaint as she did not want anyone disciplined based on it. *Id.*

Ford Labor Relations and UAW personnel nonetheless re-interviewed Allen and seven other Ford employees regarding her complaint. DSOF at ¶¶ 39, 43. Allen supplemented her complaint with a "chronology" of all the allegedly offensive language that she had overheard at CAP since 2012. *Id.* at ¶ 40. Allen listed six incidents, all involving unnamed coworkers, in which she had overheard crude sexual remarks over the course of a two-year period (from 2012 through 2013). *Id*. Ultimately, Ford did not corroborate Allen's complaints about the engineering manager and could not identify the unnamed coworkers in Allen's chronology. *Id.* at ¶ 43. Ford did conclude the hourly carpenter had used inappropriate language and suspended him for a month. *Id.* at ¶ 44.

Next, Allen complained in February 2014 about two instances of phallic graffiti at the Plant. DSOF ¶ at 46. When interviewed, Allen said she had actively sought out the graffiti after she overheard a radio call requesting that a painter cover it up. *Id.* at ¶ 48. By the time she arrived, one of the images had been removed. *Id.* Allen asked a coworker to text her a picture of the covered-up graffiti because she "wanted to see it." *Id.* A joint Ford/UAW team investigated and interviewed 10 people (including Allen) but could not identify who placed the graffiti. *Id.* at ¶ 49.

The following month, Allen submitted two complaints the same day about an incident outside a men's bathroom. DSOF at ¶ 63. A joint Ford/UAW team investigated and determined that Allen and her male co-worker had put up a "restroom closed" sign and were waiting outside the bathroom to start repairs once it was empty; she and her co-worker told an approaching male employee not to enter the bathroom, but he did anyway. *Id.* The team found no basis to believe that Allen had been sexually harassed. *Id.* During her interview, Allen claimed for the first time that she was "accidental[ly] flash[ed]" by a supervisor at some point in 2013 when the supervisor had entered a bathroom where she was working, apparently unaware that Allen was there; he then "apologized" to her for this "accident[]." *Id.*

IV.     **Allen's 2014 Retaliation Allegations**

5

In February and March 2014, Allen made a series of claims that she had been "outed" as a complainant. Allen first made a hotline call, alleging that "HR used her name" during an antiharassment training; however, she later withdrew that complaint because she "found out" HR had not actually done so. DSOF at ¶ 50. Allen next alleged that at a UAW meeting, the UAW Chairman had disclosed that the UAW's Civil Rights Committee intended to investigate a complaint Allen had made to the UAW. *Id.* at ¶ 52. Then, Allen alleged that a Labor Affairs Manager had told employees "to be careful" because Allen was preparing to sue Ford. *Id.* at ¶ 60. Allen later testified she never heard this comment, but that others had told her about it secondhand. *Id.*

In May 2014, Allen emailed Labor Relations, complaining about an argument she had with an engineering specialist. DSOF at ¶ 67. The engineering specialist alleged Allen refused an assignment, became confrontational, and walked off the job. *Id.* at ¶ 66. Allen claimed she refused an "unsafe" job and asserted the engineering specialist "seems to have issues with women and minorities." *Id.* at ¶¶ 67–68. When asked why she believed that Allen said: "it's been other women and minorities who had issues" with him, and "I know this . . . because they told me." *Id.* at ¶ 68. The Plant closed this complaint without substantiating it. *Id.* at ¶ 69.

Allen then made several complaints in June and July 2014. DSOF at ¶ 70. Allen complained that a female coworker wore "short [] sleeves and Capri pants" at work. *Id.* A month later, Allen alleged an area manager was "retaliat[ing] against [her]" by asking her why she was using her phone at work. *Id.* at ¶ 71. Allen then went on leave for five months. *Id.* Labor Relations interviewed her upon her return but did not substantiate her complaints about the area manager's retaliation. *Id.* at ¶¶ 72-73.

V.      **Allen's 2015 Complaints and Retaliation Allegations**

In March 2015, Labor Relations interviewed Allen after she complained that a team manager was allegedly mistreating two other women. DSOF at ¶ 78. According to Allen, one woman had submitted a complaint about the manager, and another had alleged the manager was wrongly denying her leave. *Id.* Allen also alleged a third woman whom Allen did not know, but had "heard of," was "known for grabbing [men's] private parts." *Id.* Labor Relations informed Allen after it had investigated and closed out the complaints. *Id.* at ¶ 79.

In April 2015, Allen complained about "tension" with a male coworker. DSOF at ¶ 80. Allen said she was experiencing a "hostile work environment" because the coworker "does not want to work with [her]." *Id.* at ¶¶ 80–81. Allen claimed it was "a form of harassment" that the coworker was "allowed to come to work." *Id.* Allen also complained it "fe[lt] like [her] supervisors [were] using forms of retaliation against [her]" because the coworker received overtime opportunities that Allen thought she

6

deserved. *Id.* at ¶¶ 83–84. Ford investigated and found that the coworker had a different job classification than Allen (and thus, different overtime eligibility). *Id.* at ¶ 86. Ford also reminded Allen she did not have her own work area and needed to share space with others. *Id.* Also in April 2015, Allen made complaints about a female coworker. DSOF at ¶ 87. According to Allen, the coworker had said, "I will fuck a bitch up, male or female," and gestured toward Allen. *Id.* Allen alleged the coworker "is known to grab mens [sic] personal parts," and squeeze men's butts and "hug" them, which Allen did not "agree with." *Id.*

In August, Allen made a hotline call, alleging the same female coworker had told Allen and a male coworker to "get the fuck out" of an area and said to Allen, "fuck you bitch." *Id.* at ¶ 89. Labor Relations investigated, corroborated the incident, and suspended Allen's female coworker. *Id.* at ¶ 93. In 2016, Allen spent just three months working at CAP before transferring to another Ford facility. She made no harassment complaints during that three-month period. *Id.* at ¶ 116.

## VI. Procedural History

Allen previously joined with other plaintiffs to file suit against Ford in 2014, seeking to certify a putative class of women who claimed to have been subjected to sexual harassment. DSOF at ¶ 8. After the Court denied two class certification attempts, Allen's claims were severed from those of her co-plaintiffs and reassigned to this Court. *Id.* at ¶¶ 10–11.

In this suit Allen's operative complaint [73] contains the following counts: (1) Sexual harassment, gender discrimination and hostile work environment on the basis of sex under Title VII; (2) Retaliation in violation of Title VII; (3) Race discrimination, racial harassment and hostile work environment on the basis of race under Title VII; (4) Race discrimination under 42 U.S.C. § 1981; and (5) Assault.[3]

## ANALYSIS

### I. Hearsay

Ford first argues that Allen attempts to rely on inadmissible hearsay in opposing summary judgment. Hearsay is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). "Hearsay is inadmissible in summary judgment proceedings

---

[3] As Ford points out [80], Allen's intentional infliction of emotional distress claim was dismissed in the previous litigation, *Van*, 14-cv-8708, Dkt. 53, and was included in Allen's complaint for purposes of appeal only, Dkt. 62 at 2. Allen does not contest this in her response. Dkt. 88.

7

to the same extent that it is inadmissible in a trial." *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th Cir. 1998).

Ford argues that Allen's statements supporting her sexual harassment claim such as (1) "everyone knows" one female was "known for grabbing" male workers; (2) another woman was "known to grab [men's] personal parts"; and (3) a supervisor was known to have "several girlfriends in the building," DSOF at ¶¶ 78, 87, 102, are inadmissible hearsay. As for her racial harassment claim, Ford argues that though Allen asserts that she "was repeatedly and frequently referred to as 'black bitch'" and a host of derogatory terms in the workplace, she testified that no one ever called her these terms to her face and she was only aware of these comments from other coworkers. *See* Dkt. 73 at ¶ 62a-f; DSOF at ¶¶ 107–108.

Allen argues that the inappropriate discussions at work were so pervasive that if she complained every time, she would not be able to work. Dkt. 88 at 9. This does not address the problem that she is attempting to rely on inadmissible hearsay. Allen may not rely on hearsay. *See King v. Illinois Dep't of Juv. Just.*, No. 12 C 5450, 2014 WL 1560303, at *3 (N.D. Ill. Apr. 17, 2014) (explaining that "hearsay that cannot serve to create a genuine question of fact on summary judgment."). As such, the Court declines to consider the hearsay statements in determining whether there is a genuine issue of material fact as to any of her claims.

## II.  Sexual and Racial Harassment and Hostile Work Environment

Title VII's antidiscrimination provision makes it "unlawful ... for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To prevail on a hostile work environment claim, Allen must show that "(1) the work environment was objectively and subjectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). "[H]arassment which is 'sufficiently severe or pervasive to alter the conditions of ... employment' is actionable under Title VII." *Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 635 (7th Cir. 2009) (citation omitted).

Allen's harassment and hostile work environment claims are mainly premised on hearsay statements, which as discussed, are inadmissible at this stage. The non-hearsay statements Allen relies on do not show a workplace "with discriminatory intimidation, ridicule and insult, … sufficiently pervasive to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). Though Allen had concerns with the language used amongst employees as well as physical contact such as hugging in the workplace, this does not

8

amount to severe or pervasive conduct. And importantly, Allen does not allege any sexually or racially harassing conduct or comments directed *towards her*.

As such, Ford is granted summary judgment on Allen's racial and sexual harassment and hostile work environment claims.

### III. Race and Gender Discrimination

Allen claims that Ford subjected her to adverse actions because of her gender and race in violation of Title VII. Additionally, she alleges race discrimination under Section 1981. Dkt. 73 at 2, 10. This Court uses the same standards in evaluating these claims. *Mahran v. Advoc. Christ Med. Ctr.,* 12 F.4th 708, 714 (7th Cir. 2021) (observing that the "legal standard is the same under" Title VII and Section 1981).

In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Purtue v. Wisconsin Dep't of Corr.,* 963 F.3d 598, 602 (7th Cir.), reh'g denied (July 31, 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)).

As discussed, Allen's reliance on hearsay statements will not be considered by the Court. Allen otherwise does not provide evidence to create a factual issue that she was discriminated against on a prohibited ground or suffered a materially adverse employment action.

Allen alleged that she was suspended twice in 2012 for leaving the CAP without permission and once in 2013 for being late. DSOF at ¶¶ 61, 104, 112. Allen asserts other non-Black and male employees were treated less harshly. However, her deposition testimony undercuts these claims. As for the 2012 suspensions, Allen testified she was suspended alongside a white male coworker. DSOF at ¶ 112; Def. Ex. B-2 at 29:10-23. Regarding the reprimand based on tardiness, Allen testifies that she and another Black woman were disciplined but the discipline was not removed from her record because she was Muslim and not because of her race or sex. DSOF at ¶ 61. This is a bias based on religion (not at issue in this case) not race.

Allen also alleges that she suffered an adverse employment action when she was asked to carry a radio, micromanaged and denied lunch breaks. DSOF at ¶¶ 22, 24, 27–29. These actions do not rise to the level of a materially adverse employment action. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (materially adverse employment action is one where the plaintiff suffers "a significant change in employment status.").

Finally, regarding Allen's claim that she was denied overtime, Allen must show that "she applied for the overtime work, that she was qualified to do the overtime work, [and] that the overtime was given to people in the same job position." *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010). Allen does not provide any evidence that she was denied overtime due to her gender. For this reason, Ford is granted summary judgment on Allen's race and gender discrimination claims.

## IV. Retaliation

"Title VII forbids retaliating against an employee 'because [she] has opposed any practice made ... unlawful ... by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Collins v. American Red Cross*, 715 F.3d 994, 998 (7th Cir.2013) (quoting 42 U.S.C. § 2000e–3(a)). To survive summary judgment on a Title VII retaliation claim under the direct method of proof, a plaintiff must submit evidence from which a jury could reasonably conclude that (1) [she] engaged in statutorily protected activity; (2) [she] suffered a material adverse action; and (3) a causal link between the two. *See Porter v. City of Chi.*, 700 F.3d 944, 957 (7th Cir.2012). Title VII retaliation claims "require traditional but-for causation, not a lesser 'motivating factor' standard of causation." *Reynolds v. Tangherlini,* 737 F.3d 1093, 1104 (7th Cir.2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013)). *See also Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014).

Allen's retaliation claim fails because she fails to identify a materially adverse action or that any action by Ford was causally linked to her complaints. Allen's contention that she was outed as a complainer by the Labor Affairs Manager and UAW Chairman is supported only by hearsay statements. Allen's response to Ford's arguments regarding her retaliation claim are otherwise undeveloped. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered). Therefore, Ford is granted summary judgment on this claim (Count 2).

## V. Assault

Finally, the Court agrees with Ford that the assault claim is preempted. The Illinois Workers' Compensation Act preempts the assault claim because the Act bars employees from "suing an employer for a co-employee's intentional torts when the employer 'did not direct or expressly authorize the employee to commit' the intentional tort." *Carroll v. YMCA of Metro Chicago, LLC*, No. 13-cv-9307, 2015 WL 149024 at *4 (N.D. Ill. Jan. 9, 2015) (quoting *Meerbrey v. Marshall Field & Co. Inc.*, 564 N.E.2d 1222, 1226 (Ill. 1990).

10

Allen has failed to respond to Ford's argument on this issue, waiving any response. *See Rozumalski*, 937 F.3d at 925. Allen's contention that she sought worker's compensation for the alleged assault is not relevant and does not create an issue of fact that Ford is liable for assault. Summary judgment is granted to Ford on this claim as well.

## CONCLUSION

For the stated reasons, Defendant's motion for summary judgment [79] is granted. The Clerk is directed to enter judgment in Defendant's favor and against Plaintiff and terminate the case.

E N T E R:

Dated: September 8, 2023

MARY M. ROWLAND
United States District Judge

11